# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-2168

_____

Donald L. Boss, Jr.

*Petitioner - Appellant*

v.

Nick Ludwick

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa - Sioux City

_____

Submitted: February 11, 2014
Filed: July 25, 2014
[Published]

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

PER CURIAM.

In 2002, an Iowa state jury convicted Donald Boss Jr. of the first-degree murder of his son Timothy. Having exhausted direct and collateral appeal avenues in state

court, Boss petitioned for habeas relief in federal district court,[1] which denied relief. We affirm.

## I. *Background*

Timothy, a special-needs child, was the adopted son of Boss and his wife Lisa. The couple received assistance from the state of Michigan for his care. On January 2, 2002—at the request of the State of Michigan—sheriff's deputies from Plymouth County, Iowa  went to the Boss residence to check on Timothy's welfare. Lisa told them that Timothy was living with her sister in Kentucky. When authorities asked the sister about Timothy, she said that Timothy did not live with her and that she had not seen him in a year and a half.

Deputies returned to the Boss home on the night of January 2, and found that Lisa and the other Boss children were gone. Boss agreed to speak to the deputies and told them that Lisa had taken Timothy back to Michigan. Donald agreed to return with the deputies to the sheriff's office where he admitted that he had lied earlier. He admitted that Timothy was dead, the death had not been accidental, he had beaten Timothy, and that he may have given Timothy an overdose of the medication Timothy took to treat attention deficit disorder. Boss was charged with first-degree murder. Lisa was also charged with crimes related to Timothy's death. At that time, law enforcement had not located Timothy's body.

Michael Williams, Boss's defense counsel, advised him to disclose the location of the body and prepared a statement to that effect for Boss to sign. During direct examination at a February 25, 2002 bond review hearing, Williams asked Boss if he "sign[ed] this document directing the authorities to the location of the body of

---

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

Timothy Boss?" Boss responded, "Yes, I did." Williams then handed the document to the prosecutor.

During cross-examination by the prosecutor, Boss confirmed that he had signed the document and that the document stated that Timothy's body was located "in the middle of the floor of the basement room" in Boss's home. The prosecutor then asked, "Did you put him under the floor in that location?" Williams objected to that question, but indicated that the document gave "consent . . . for the authorities to enter into [Boss's] residence and to extract." Boss then invoked the Fifth Amendment and refused to answer the prosecutor's question. After Boss invoked the Fifth Amendment, the prosecutor asked the court to consider Boss's invocation when deciding whether to reduce Boss's bond. The court agreed that it would, whereupon Williams took "exception" and stated that "[t]he Fifth Amendment is to protect the guilty as well as the innocent."

After receiving Boss's note disclosing the location of the body, prosecutors contacted law enforcement. Officers conducted a new search at the Boss home and located Timothy's body buried beneath the cement floor of the basement. While no specific cause of death could be determined, the body showed signs of injuries to the bones of the arms and teeth. Two of Boss's children testified that Timothy was beaten and left tied to a chair before he died. Evidence also revealed that Boss buried Timothy in a hole that he cut in the basement floor, poured a concrete slab over the body, and covered it with carpet. On December 12, 2002, an Iowa state jury convicted Boss of first-degree murder, whereupon he was sentenced to life imprisonment without possibility of parole.

After exhausting direct review, Boss filed for post-conviction relief in the Iowa state courts. Boss contended that he received ineffective assistance from trial counsel because Williams inadequately advised him about whether to disclose the location of

Timothy's body and then disclosed the location of the body during the bond review hearing.

Williams testified before the state trial court during state post-conviction proceedings that his actions reflected a legitimate trial strategy—in his words, "blame Lisa." In his habeas relief denial order, the federal district court summarized Williams's testimony and strategy in the state trial court as follows:

• Williams believed that "disclosure of the body would be useful in demonstrating Boss's cooperation to a jury";

• Williams believed that disclosure of the body "could be used to shift the blame for the death to Lisa Boss," because it would allow location of "cigarette butts which could have been used to tie Lisa Boss to the crime scene and the burial," even though no cigarette butts were ultimately found during the recovery of the body, where Williams's strategy "from the outset . . . was to blame Lisa";

• Williams was afraid Lisa would cooperate "and receive whatever benefits arose from disclosure of the body";

• Williams was concerned that Lisa "was uncontrollable and giving false statements to officers, and that these potentially damaging false statements were part of the press coverage";

• Williams was "concern[ed] that Lisa Boss's legal counsel would seek a deal";

• Williams believed that "evidence from the body that was negative to their legal strategy would have deteriorated over time [but] that positive evidence supporting his theory of accidental overdose may have been preserved";

• Williams believed "that a disclosure of the body would help Boss' standing in the community and with the press," because "it would make

him appear to be cooperating with the investigation," and he "believed that the public would not necessarily believe that simply because Boss buried Timothy that Boss had killed Timothy"; and

• Williams believed "the body would have been discovered by investigators at some point."

*Boss v. Ludwick*, 943 F. Supp. 2d 917, 926 (N.D. Iowa 2013).

Applying the standard announced in *Strickand v. Washington*,[2] the Iowa Court of Appeals denied post-conviction relief, finding that Boss's counsel was not constitutionally deficient. The court reasoned:

It is clear from the record that defense counsel was concerned that Lisa would reveal the location of the body. Counsel also was concerned about the media coverage of the case and Lisa's statements in the media. We conclude there was a rational explanation for disclosing the location of the body as quickly as possible to "beat [Lisa] to the punch." While the ultimate effect of revealing the location of Timothy's body may have been prejudicial to Boss's defense, we agree with the postconviction court that defense counsel had a "legitimate strategy in mind" that was based on extensive experience, considered deliberation, discussion with the defendant, and the unfolding circumstances as the case proceeded. This is not a failure in an essential duty. Boss has not overcome the strong presumption that his counsel's performance fell within the wide range of reasonable professional assistance. See *Strickland*, 466 U.S. at 689–90, 104 S. Ct. at 2065–66, 80 L. Ed. 2d at 693–94.

Boss further asserts the disclosure "raises serious questions concerning disclosure of privileged communications." The record shows that defense counsel had Boss disclose the location of the body only with his informed consent. There was discussion about the disclosure but there was no disclosure until the final agreement by Boss. Boss

[2]466 U.S. 668 (1984).

acknowledged considerable discussion and acknowledged eventually being convinced. He conceded consenting to the disclosure based on the advice of counsel, even though he now claims to have doubted the rationale. *Boss v. State*, 789 N.W.2d 165, *3 (Iowa Ct. App. 2010) (table decision).

Boss subsequently sought post-conviction relief in federal court, under 28 U.S.C. § 2254, where he renewed his arguments that counsel was ineffective both for disclosing the location of Timothy's body and for inadequately advising him about disclosing the body. Applying the § 2254 standards, the district court concluded that the Iowa state court decisions were not "contrary to," nor "involved . . . unreasonable application[s] of" federal law, nor did they represent "unreasonable determination[s] of the facts in light of the evidence presented" to the state courts. 28 U.S.C. § 2254(d)(1). The district court found that Boss did not prove that the Iowa courts reached unreasonable factual conclusions. *Id*. § 2254(d)(2). The court analyzed the state trial court's factual findings at some length and stated "[e]ven were I inclined to make a different determination, on the record evidence, I cannot conclude that the Iowa courts' determinations were 'unreasonable,' in light of the evidence before the state courts." *Boss v. Ludwick*, 943 F. Supp. 2d at 954.

Boss sought and the district court issued a certificate of appealability as to whether the Iowa Court of Appeals' denial of relief on Boss's claims represented an "unreasonable determination of the facts" or was "contrary to" or an "unreasonable application of" *Strickland v. Washington*.

## II. *Discussion*

On appeal, Boss asserts that counsel was ineffective both for disclosing the location of the victim's body and for inadequately advising Boss about the merits of disclosing the location of the body. He alleges two errors on the part of the Iowa Court of Appeals for which he seeks reversal.

Boss first contends that the Iowa Court of Appeals unreasonably applied *Strickland* by failing to find that Williams's performance was constitutionally deficient. According to Boss, "[t]he Iowa Courts failed to adequately consider professional norms in assessing counsel's effectiveness," which the *Strickland* Court identified as "guides to determining what is reasonable." *Strickland*, 466 U.S. at 688.[3]

Boss next contends that the Iowa Court of Appeals "failed to consider whether counsel *adequately consulted* with Boss about the significant risks associated with disclosure." Boss further avers that the disclosure violated Williams's duty of confidentiality because Boss did not give *informed* consent.

"In a habeas proceeding, this Court reviews the district court's conclusions of law de novo and its factual findings for clear error." *Bobadilla v. Carlson*, 575 F.3d 785, 790 (8th Cir. 2009) (citation omitted). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), where a petitioner's claims have been "adjudicated on the merits in State court proceedings," we may grant relief only where the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3]Boss also asserts that it was error for the Iowa Court of Appeals to conclude that the disclosure of the body "may have been prejudicial" to his defense and nevertheless find "that his counsel's performance fell within the wide range of reasonable professional assistance." However, the prejudice and deficient performance prongs of an ineffective-assistance-of-counsel claim are separate and distinct. A petitioner must satisfy both prongs—not merely conflate the two—to obtain relief.

28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have "independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "A decision is contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'" *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (quoting *Williams*, 529 U.S. at 405 (2000)). The Court explained:

> On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Williams*, 529 U.S. at 406.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

With respect to § 2254(d)(2)'s "unreasonable determination of the facts" clause, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Furthermore, we presume that the state court's factual findings are correct—a presumption the petitioner must rebut with "clear and convincing evidence." *Id*. at 474 (quoting 28 U.S.C. § 2254(e)(1)).

Because Boss seeks relief based on two ineffective-assistance-of-counsel claims, premised on the Sixth and Fourteenth Amendments, the relevant "clearly established Federal law" is the Supreme Court's decision in *Strickland*. Under *Strickland*, a petitioner claiming that his counsel was constitutionally ineffective "must show: (1) that his lawyer's representation fell below an objective standard of reasonableness; and (2) that the lawyer's deficient performance prejudiced the defendant." *Abernathy v. Hobbs*, 748 F.3d 813, 816 (8th Cir. 2014) (citing *Strickland*, 466 U.S. at 688, 694). A petitioner must satisfy both prongs of *Strickland* to obtain relief. *Wong v. Belmontes*, 558 U.S. 15, 16 (2009).

*Strickland* affords counsel "wide latitude . . . in making tactical decisions," therefore, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. A petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (quotation and citation omitted). We must acknowledge that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*. at 689–90 (citation omitted).

Boss has failed to demonstrate entitlement to relief. The Iowa Court of Appeals correctly identified the governing framework from *Strickland* and applied it. Boss's claim is controlled by the Supreme Court's *Williams* decision and is "in accord with . . . *Strickland*." *Williams*, 529 U.S. at 406. Consequently, the Iowa Court of Appeals' decision to deny relief on both of the ineffective-assistance-of-counsel claims is not "contrary to" clearly established federal law.

Nor are we persuaded that the Iowa Court of Appeals "unreasonably applied" the *Strickland* standard. While the court acknowledged the apparent risks associated with counsel's disclosure strategy, it concluded that the disclosure was part of a "legitimate trial strategy," and therefore fell within the bounds of professional competence. Boss effectively contends that any decision that "many would not take" or that courts could describe as "unusual" is a "departure from the professional standards" and is therefore constitutionally deficient. This is not consistent with either counsel's "wide latitude" or our "highly deferential" review. Assuming *arguendo* that we believe the Iowa Court of Appeals applied *Strickland* incorrectly, we cannot say that in these circumstances it did so *unreasonably*.

Finally, Boss has not demonstrated that the Iowa courts made an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." While Boss argues at some length that counsel "had a . . . duty to outline just how risky [the disclosure] was," he does not identify any evidence—much less clear and convincing evidence—indicating that the Iowa courts unreasonably erred.

The Iowa Court of Appeals did not render a decision that was "contrary to" or involved "unreasonable application of" clearly established law. Nor did the state court base its decision on an "unreasonable determination of the facts."

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____